```
1                 IN THE UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF ARKANSAS
2                         WESTERN DIVISION

3   UNITED STATES OF AMERICA,

4          Plaintiff,

5     v.                               No. 4:09CR00049-01 SWW

6                                      January 19, 2011
                                       Little Rock, Arkansas
7                                      12:58 p.m.
    LDONPATRICK BONES a/k/a Muffin,
8
           Defendant.
9

10                     TRANSCRIPT OF SENTENCING
              BEFORE THE HONORABLE SUSAN WEBBER WRIGHT,
11                 UNITED STATES DISTRICT JUDGE

12                    _____

13  APPEARANCES:

14  On Behalf of the Government:

15      MR. MICHAEL S. GORDON, Assistant U.S. Attorney
          U.S. Attorney's Office
16        425 West Capitol Avenue, Suite 500
          Post Office Box 1229
17        Little Rock, Arkansas  72201-1229

18

19  On Behalf of the Defendant:

20      MR. RUFUS THOMAS BUIE, III, Attorney at Law
          Boyd & Buie
21        308 Court Square
          DeWitt, Arkansas  72042

22

23  Defendant present.

24       Proceedings reported by machine stenography and displayed
    in realtime; transcript prepared utilizing computer-aided
25  transcription.
```

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1                          **I N D E X**

2   **WITNESSES FOR THE DEFENDANT:   Direct   Cross   Redirect   Recross**

3   BRITTANY CARROLL                    5

4   PATRICIA GRAYSON                    9

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

```
1                    P R O C E E D I N G S
2             THE COURT:  Good afternoon.
3             MR. GORDON:  Good afternoon.
4             THE COURT:  This is a hearing, a sentencing hearing,
5    in the case of United States versus Ldonpatrick Bones, also
6    known as Muffin.  Let the record reflect that Mr. Bones is
7    present with his attorney, Mr. Rufus Thomas Buie, III, and the
8    United States is represented by Mr. Michael Gordon.
9        I would like for Mr. Bones to come forward with Mr. Buie,
10   and the clerk will swear Mr. Bones.
11        LDONPATRICK BONES, DEFENDANT, DULY SWORN
12            THE COURT:  Mr. Bones, are you under the influence of
13   any drugs or medicine or anything which could interfere with
14   your ability to understand this proceeding?
15            THE DEFENDANT:  No, ma'am.
16            THE COURT:  Mr. Buie, are you confident that Mr. Bones
17   is competent to proceed today?
18            MR. BUIE:  Yes, Your Honor.
19            THE COURT:  I find that Mr. Bones is competent to
20   proceed and we will proceed.
21        Mr. Buie, have you reviewed the presentence report with
22   Mr. Bones?
23            MR. BUIE:  I have, Your Honor.
24            THE COURT:  And do you and Mr. Bones have any
25   objections to the report?
```

1          MR. BUIE:  I had inserted or sent in objections.  One

2     was basically to give me an opportunity to look at some of his

3     history.  I withdraw that objection.  I think that was noted on

4     the final report.  And I do withdraw that objection, and there

5     are no other objections.

6          THE COURT:  All right.  And Mr. Gordon, I have two

7     questions for you.  First, are you going to ask the Court for a

8     third point for acceptance of responsibility?

9          MR. GORDON:  Yes, Your Honor.

10          THE COURT:  All right.  I will grant that motion for a

11     third point.  And do you have any objections to the presentence

12     report, Mr. Gordon?

13          MR. GORDON:  No, Your Honor.

14          THE COURT:  Very well.  The Court adopts the

15     presentence report as amended to give Mr. Bones a third point

16     for acceptance of responsibility.  The total offense level is

17     now 31.  The criminal history category is VI.  The custody

18     range is 188 to 235 months incarceration followed by no fewer

19     than four years of supervised release.  The fine range is

20     $15,000 to $2 million.  There are no restitution needs.  And

21     there is a mandatory 100-dollar special assessment.

22          Mr. Buie, do you have any evidence you would like to

23     present in mitigation?

24          MR. BUIE:  Yes, Your Honor, some testimony.

25          THE COURT:  All right.  You may call your first

1    witness.

2         And, Mr. Bones, if you're not the witness, you may be

3    seated at this time.

4              MR. BUIE:  I call Brittany Carroll.

5              THE COURT:  Ms. Carroll, the clerk will swear you.

6         **BRITTANY CARROLL, DEFENDANT'S WITNESS, DULY SWORN**

7              THE COURT:  The witness stand is right here.  And the

8    witness chair is kind of turned, but you can straighten it up.

9    Speak into that microphone, please.

10        Go ahead, Mr. Buie.

11                        DIRECT EXAMINATION

12   BY MR. BUIE:

13   Q.   Your name is Brittany Carroll?

14   A.   B-R-I-T-T-A-N-Y.

15   Q.   How do you spell Carroll?

16   A.   C-A-R-R-O-L-L.

17   Q.   How old are you, Brittany?

18   A.   24.

19   Q.   Where do you live?

20   A.   Pine Bluff.

21   Q.   How long have you lived in Pine Bluff?

22   A.   About eight or nine months.

23   Q.   Who do you live with?

24   A.   Me and my son.

25   Q.   What's your son's name?

Carroll – Direct

1    A.    Malakhi.

2    Q.    And what is his last name?

3    A.    Bones.

4    Q.    And how do you spell Malakhi?

5    A.    M-A-L-A-K-H-I.

6    Q.    M-A-L-A-K-H-I?

7    A.    Yes.

8    Q.    And when was he born?

9    A.    April 30th, 2008.

10   Q.    About how old was he when Ldon was incarcerated here from

11   the federal court?

12   A.    Nine months.

13   Q.    And is Ldon the father of that child?

14   A.    Yes, sir.

15   Q.    Do you know if he has any other children?

16   A.    Yes.

17   Q.    How many other children does Ldon have?

18   A.    Two.

19   Q.    Is that from a different mother?  Are they from a

20   different mother?

21   A.    Yes.

22   Q.    And how old are they?  Do you know?

23   A.    One is five, and maybe the other one is eight, seven or

24   eight.

25   Q.    Before Mr. Bones or Ldon was incarcerated, did he have

Carroll - Direct

1    contact with his children?

2    A.   Yes.

3    Q.   Including the child you have with Ldon?

4    A.   Yes.

5    Q.   And how would you describe your relationship with Ldon?

6    A.   It's pretty good.

7    Q.   Any problems of violence or abuse or anything like that?

8    A.   No, never.

9    Q.   How would you describe -- I take it you've seen Ldon

10   interact with his children including the child you have with

11   him.  How would you describe how he interacts with his kids?

12   A.   He was a good father.

13   Q.   If Ldon was not incarcerated, would it be helpful to have

14   financial assistance from him?

15   A.   Yes.

16   Q.   Prior to his incarceration, did he have the ability to

17   provide financial assistance?

18   A.   Yes.

19   Q.   And did he do that?

20   A.   Yes.

21   Q.   Is there anything else you would like to say on behalf of

22   Ldon?

23   A.   Basically I know he's supposed to, you know, pay his debt

24   to society like what he did was wrong, but, like, we all need a

25   second chance at life.  It's not just punishing him.  It's

1   punishing everybody else, too.

2           MR. BUIE:  That's all I have, Your Honor.

3           THE COURT:  I want to ask about his employment.  How

4   did he provide financial assistance?  Where did he work?

5           THE WITNESS:  He was working, like, jobs here and

6   there.  Like, he was working at Murray's Trucking Company --

7           THE COURT:  I'm sorry?

8           THE WITNESS:  He was working for Murray's Company for

9   awhile, a trucking company.

10          THE COURT:  You don't know when that was?

11          THE WITNESS:  No.

12          THE COURT:  All right.  Go ahead, Mr. Gordon.

13          MR. GORDON:  No questions, Your Honor.

14          THE COURT:  All right.  Thank you, Ms. Carroll.  You

15  may stand down.

16          MR. BUIE:  Patricia Bones.

17          THE COURT:  Patricia Bones.

18      **PATRICIA GRAYSON, DEFENDANT'S WITNESS, DULY SWORN**

19          THE COURT:  Ms. Bones.

20          MR. BUIE:  Her last name is Grayson now, Your Honor, I

21  keep calling her Bones, but it's Patricia Grayson.

22          THE COURT:  All right, Ms. Grayson.

23          THE WITNESS:  Hi.

24          THE COURT:  Hi.

25                        DIRECT EXAMINATION


                    Judith A. Ammons, RPR, CRR, CCR
                      United States Court Reporter

Grayson - Direct

1   BY MR. BUIE:

2   Q.   You are Patricia Grayson?

3   A.   Yes.

4   Q.   And you're Ldon's mother?

5   A.   Yes, sir.

6   Q.   And you were here way back when he had turned himself in

7   the day we had court that day; is that correct?

8   A.   Yes, sir.

9   Q.   And I believe you had testified early on during the

10  pretrial release proceedings; is that correct?

11  A.   Yes, sir.

12  Q.   And how old are you, Ms. Grayson?

13  A.   50.

14  Q.   How old?

15  A.   50.

16  Q.   And where do you live?

17  A.   I live in Holly Grove.

18  Q.   And how long have you lived there?

19  A.   All my life.

20  Q.   And did Ldon grow up there with you in Holly Grove?

21  A.   Yes, sir.

22  Q.   It's okay.

23  A.   Yes, sir.

24  Q.   That's okay.  And when he was around -- well, around 19,

25  did he move out to go to college?

Grayson - Direct

1    A.   Yes, sir.

2    Q.   Okay.  Did he run into some problems there?

3    A.   Yes, sir.

4    Q.   And what happened as a result of that?

5    A.   I made him come back home and go to work.

6    Q.   Where did he go to work then?

7    A.   He worked at a Producer's for awhile.

8    Q.   Is that Producer's Rice Mill in Stuttgart?

9    A.   Yes, sir.

10   Q.   And about how long did he live with you at that point when

11   he came back from college?

12   A.   He lived with me until he moved out on his own.  He got

13   his own place.

14   Q.   Do you know about how old he was then?

15   A.   He was about 21.

16   Q.   Okay.  And at some point did he move back home with you?

17   A.   Yes, sir.

18   Q.   When was that?

19   A.   After he got out -- he had been locked up.  So after he

20   got out, he moved home with me.

21   Q.   And did he find a job?

22   A.   Yes, sir.

23   Q.   Where?

24   A.   He was gone on a job like helping people, some kind of

25   truck company in Stuttgart, Murray Truck Company.  He was

Grayson - Direct

1    working for them, they was hauling gravel and stuff like that.

2    Q.   Now, did he ever work for Lennox Industries?

3    A.   Yes, sir, he did work for Lennox after he came back home.

4    Q.   Was that before, or after that trucking company?

5    A.   It's before.

6    Q.   About how long did he work at Lennox, do you remember?

7    A.   He worked for Lennox over a year.

8    Q.   Okay.  Now, since you had had the time to -- since he

9    lived with you growing up, and the other times that he lived

10   there at your home, did he have a tendency towards violence

11   or --

12   A.   No, sir.

13   Q.   -- any violent behavior?

14   A.   No, sir.

15   Q.   How did he treat other people?

16   A.   He treated everybody with respect, even people he didn't

17   know.

18   Q.   At times when he's been in trouble, has he -- has he

19   always admitted what he's done and --

20   A.   Yes, sir, he admits to what he have done.

21   Q.   And do you know all three of his children?

22   A.   Yes, sir.

23   Q.   Do you have much contact with them?

24   A.   I see them at holidays, and I do for them for Christmas

25   because he told us to try to take care of his kids.

Grayson - Direct

1    Q.   And before Ldon was incarcerated, did he have contact with

2    all of his children?

3    A.   Yes, sir.

4    Q.   And how would you describe his relationship with his kids?

5    A.   He was good with his kids.  He loved them kids more than

6    anything.

7    Q.   If and when Ldon is released at some point, will you be --

8    still be there for him to help him and help him with a place to

9    live and with his children?

10   A.   Yes, sir.

11   Q.   And are you married right now?

12   A.   Yes, sir.

13   Q.   And what's your husband's name?

14   A.   Aaron Grayson.

15   Q.   Do y'all live there in your home in Holly Grove together?

16   A.   Yes, sir.

17   Q.   Anybody else live in your home?

18   A.   I have a 19-year-old son, he's in college over in Little

19   Rock.

20   Q.   Is that Coty?

21   A.   Yes, sir.  When he's not in school, he's here with us.

22   Q.   Is he here today?

23   A.   Yes, sir.

24   Q.   And you've got several family members here today?

25   A.   Yes, sir, my husband, and I got four of my sisters -- five

1    of my sisters.

2    Q.   Is there anything -- just in closing, is there anything

3    that you would like the Court to know before sentencing?

4    A.   He's a good person.  And I would do anything if y'all

5    would let me have one more chance with my son.  That's all I

6    would like to say.

7    Q.   Yes, ma'am.

8    A.   No, sir.  That's all.  I just want another chance with my

9    son.

10   Q.   Thank you, Patricia.

11           THE COURT:  Mr. Gordon?

12           MR. GORDON:  No questions, Your Honor.

13           THE COURT:  All right.  Thank you, ma'am.  Ms.

14   Grayson, thank you.

15           MR. BUIE:  I don't have any further witnesses, Your

16   Honor.

17           THE COURT:  All right.  Do you have any evidence you

18   would like to present?

19           MR. GORDON:  No, Your Honor.

20           THE COURT:  Mr. Buie, if you and Mr. Bones would come

21   forward then, I'll permit both of you to address the Court.

22       Mr. Bones, you have an absolute right to address the Court

23   before I impose sentence.

24           MR. BUIE:  He does have something he would like to

25   say.

1          THE DEFENDANT:  Well, first of all, I would like to

2   accept full responsibility for the role I played in these

3   crimes.  I'd like to apologize to my family and loved ones for

4   letting them down.  I also would like to apologize to the Court

5   system for being a burden on society and being on the wrong

6   side in the war against drugs.  Please allow me to continue to

7   construct a relationship with my family and raise my children.

8   And being a positive role model is my only pursuit at this

9   point in life.  I know I've been given more chances than I

10  deserve.  I also realize that this is my last chance to right

11  my wrongs with society.  I hope to be punished without being a

12  severe victim in this war against drugs.

13      I assure you, Your Honor, if given another chance, I will

14  no longer commit crimes.  I've been away from the streets for

15  two years now.  I realize I've got a family that loves me and

16  needs me to do right.  I don't want to disappoint them or

17  myself anymore.  I'm 30 years old now, and I've grown away from

18  my old lifestyle.  I just want to work is what I want in life.

19  I pray that this Court will have mercy on me.

20          THE COURT:  Mr. Buie?

21          MR. BUIE:  Yes, Your Honor, I would like to just

22  address the Court for a few moments.  Of course, this incident

23  took place back in June of 2008.  And I'll try not to repeat.

24  I know the Court has gone through the presentence report.  But

25  it was a result of a drug task force executing a search

1    warrant.  And when they got to the residence, there was Alonzo

2    Hampton leaving the residence and two others inside, which was

3    Ldon and Mario Buchanan.  I don't know what's ever happened to

4    Mario Buchanan.  I've never looked into that.  But ultimately

5    the charges in Monroe County against Ldon, and I'm assuming the

6    same with Mr. Hampton, were nol-prossed there since they were

7    both filed here in federal court.

8        There's no disputing what was found in the home.  There

9    were -- there was a quantity of drugs.  There was marijuana,

10   there was some crack and Ecstasy pills, and there was a pistol

11   on the kitchen counter.  I know that was a factor on the

12   Court's release decision a couple of years ago.

13       Since that time -- after that arrest, of course, Ldon had

14   bonded out.  And when we learned that federal charges had been

15   filed, he did submit himself to the Court and he came to the

16   Court actually with me and turned himself -- turned himself

17   here at that time.

18       Naturally, since that time, he's pled to possession of a

19   controlled substance with intent to distribute cocaine base,

20   over five grams and up to 50 grams.  And I just -- I realize

21   he's in that range, but I did want to note that the stipulated

22   amount was 5.79 grams, so it is on the low -- lower end of

23   that.  I don't want to split hairs, but I thought it was

24   important to note that fact that the .79 had jumped him into

25   the higher category.

1           Honestly, I understand the Court sees hundreds of these

2      cases.  And, of course, I don't know the facts and

3      circumstances of them all.  And I know that most of the time

4      the only thing that may distinguish the cases is just the

5      person that's in front of the Court.  And, of course, here

6      Ldonpatrick Bones has a great family support.  And I know some

7      of that is reflected in the presentence report.  And it's a

8      shame, but it's just part of it that oftentimes the presentence

9      report -- you know, we have records of all of our problems

10     we've had in the past.  And, unfortunately, we don't have a

11     record of anything most of the time that shows the good things

12     we've done, but that's just part of it.  And I think Ldon

13     realizes he's put himself in that position.  He's never blamed

14     anybody else.  He's always taken responsibility.

15          Just -- not as an excuse, but just to kind of put it in

16     perspective, the first two crimes that he committed, one was

17     three days before he turned 19.  That was -- his mother, I

18     think, talked about that when he had gone to college or right

19     before he had gone to college.  And then the other was about

20     two months -- two, two and a half months later.  So they

21     happened within that amount of time.

22          Then there was about -- I believe it was about a six year

23     period before another crime was committed.  And during that

24     six-year period when things were well, he was working during

25     that time.  And that may not just be coincidence.  But when --

1    he left employment and it was terminated at Lennox and one of

2    his later employments in 2006, and then the current charge in

3    '08 was when he recommitted similar offenses.

4        One thing that I think distinguishes that from those

5    crimes to now is -- and I know we've harped on the children.

6    And I certainly don't want to just use that as an excuse or

7    reason, but it is a fact of the matter that he does have three

8    children.  Even on the lower level of the sentencing range

9    under the guidelines, 188 months would be just under 16 years,

10   15 years and eight months.  And I understand the statutory

11   minimum would be five years.  His children would be somewhere

12   in the neighborhood of 19 and 17.  And I forget the age of the

13   other, the youngest -- or the oldest.  But he would basically

14   miss their entire youth, graduations.  And I know the Court is

15   aware of what all he would miss.

16       He's been in jail, like he said, for the last two years.

17   So it's not as if we're coming to court just shortly after

18   these crimes were committed and saying, "I'm sorry.  I won't

19   let this happen again."  And he's not saying that today.  He

20   knows there's going to be punishment.  There's been punishment.

21   And he's had two years to think about it.  And I know time -- I

22   suspect that time -- I've never spent time in jail, but I

23   suspect the time moves a lot slower.  I know in reality two

24   years doesn't seem like any time.  I know shortly after

25   Christmas -- I kid my secretaries that there's so many shopping

1    days left in the year and it's here before you know it.  But I

2    know that when you're in the jail cell and putting the chalk

3    marks on the wall, that it's a lot -- two years is a long

4    period of time to stay away from your family and friends, and

5    especially when you have children that young at that age.  And

6    I know he would like to be out to be with them.

7         As we've stated before, just pointing out that he's never

8    had any violent crimes in the past, no batteries, no assaults,

9    nothing like that, and he's never shirked his responsibilities

10   where he's had to come before the Court.  He's always been

11   forthright and honest, and, again, turned himself in when he

12   discovered the federal charges had been filed.

13        He also understands that we've discussed this isn't a

14   situation where he's sentenced and then there's a parole

15   eligibility time.  He understands that what he gets is what he

16   gets.  And that on top of that, he would have a minimum and

17   probably more of supervised release during which time if he

18   were to violate, he would go right back to jail a lot quicker

19   and easier than a trial and full proceeding on that.  He

20   understands that.

21        So I'll -- with all of that being said, I would just like

22   the Court to consider more than his history, which we can't

23   ignore.  I know we'd like to move past that, he would like to

24   move past it, but just ask the Court to give a fair decision.

25   That's all, Your Honor.

1          THE COURT:  Mr. Gordon, do you have any motions with

2     respect to the sentence?

3          MR. GORDON:  Your Honor, I will say for the record

4     that there is no 5K motion at this point in time.  Mr. Bones

5     will be given credit for his cooperation under Rule 35 at some

6     later date once his cooperation is complete.

7          THE COURT:  All right.  Is there any reason I

8     shouldn't impose sentence at this time, Mr. Buie?

9          MR. BUIE:  No, Your Honor.

10          THE COURT:  Would you-all like to say anything more

11     before I do?

12          MR. BUIE:  No, Your Honor.

13          THE COURT:  I've considered the presentence report and

14     I've considered what Mr. Buie and Mr. Bones have both said.

15     And I know that the Court anticipates a Rule 35 sentence

16     reduction.  I'm also mindful that Mr. Bones has spent -- well,

17     I think he's been incarcerated -- he's been detained

18     since 2009; isn't that correct?  Wasn't that the detention?

19          MR. BUIE:  I think it was February the 13th of 2009,

20     Your Honor.

21          THE COURT:  Almost two years he's been detained.  He

22     is a career offender, and so -- and he has been charged

23     multiple times with drug offenses.  He had a gun with him at

24     this point.  And I must sentence him under the guidelines or at

25     least I think that would be only fair, a guideline sentence.  I

1  realize that I have authority to sentence him to more than the

2  guidelines call for or less than the guidelines call for.  But

3  I've considered his serious criminal history, the fact that he

4  was unemployed for a long time.  I know that in many ways he is

5  a good person.  And I'm considering everything that was said by

6  Ms. Carroll and Ms. Grayson as well.  But I find the guideline

7  sentence is appropriate and I sentence him to 188 months, which

8  is the minimum under the guidelines.

9       I recommend that while Mr. Bones is in prison, that he

10  participate in the residential substance abuse treatment

11  program.  The successful completion of that program could

12  result in time off your sentence, I think a year off your

13  sentence.  I also recommend that he participate in educational

14  and vocational programs during his incarceration.  Following

15  the term of imprisonment will be four years of supervised

16  release.  And I recommend -- or I order that he be subject to

17  all of the standard conditions of supervised release and also

18  that he participate under the guidance of the probation office

19  in a substance abuse treatment program, which could include

20  drug testing, outpatient counseling, and residential drug

21  treatment.  I also recommend that he not use alcohol throughout

22  the course of his treatment -- or I shouldn't say I recommend.

23  I order that he not use alcohol throughout the course of any

24  drug treatment.

25       I will not impose a fine, however, he must pay the

1    100-dollar special assessment and he must also cooperate in the

2    collection of DNA as directed by the probation office.  That's

3    ordinarily a blood test.  In other words, they'll draw blood to

4    get your DNA.

5        I find that this is a fair sentence under 18 United States

6    Code Section 3553(a), taking into account this defendant's

7    characteristics, the seriousness of his offense, the need to

8    deter him and others from committing similar crimes, and the

9    other factors listed.

10       He is very fortunate -- you are very fortunate, Mr. Bones,

11   that you have a family who love you very much, because a lot of

12   times people who are in here being sentenced, the family will

13   not come to sentencing because they've given up on the

14   individual.  And your crimes have led to much sadness in your

15   family.  And your crimes are also depriving your children of

16   time with you.  So I hope when you get out and are on

17   supervised release and thereafter, you can remember that, that

18   the crimes you commit hurt not just you, but also your family

19   and people who love you.

20       I will seriously consider any motion under Rule 35 that

21   Mr. Gordon or someone else files on behalf of the United

22   States.  Only the United States may file a motion under Rule 35

23   for a sentence reduction.

24       Is there any particular institution where you would like

25   me to recommend that Mr. Bones be incarcerated, Mr. Buie?

1           MR. BUIE:  Texarkana.

2           THE COURT:  All right.  I will recommend Texarkana.

3    That does not mean that the Bureau of Prisons will designate

4    Texarkana as his institution, because they will classify him.

5    He has been charged with guns and drugs on more than one

6    occasion including this one, and so that can mean that he will

7    be in a higher classification than Texarkana has, but it might

8    not.  I don't mind recommending it, but if Texarkana is not

9    suitable for Mr. Bones, is there another institution you would

10   like me to recommend?

11          MR. BUIE:  Memphis.

12          THE COURT:  Memphis.  All right.  Again, I cannot

13   designate an institution for him.  The Bureau of Prisons does

14   that.  And I can only recommend.  So I recommend Texarkana, and

15   if that's not possible, then Memphis.

16      Mr. Bones, it's my duty now to tell you that you have the

17   right to appeal your conviction in this case, particularly if

18   you think your guilty plea was involuntary or if there's some

19   other fundamental defect in the proceedings that you think

20   is -- that you didn't waive when you pled guilty, or if you

21   think your guilty plea was unlawful in any way.  You also have

22   the right to appeal the sentence I just imposed, particularly

23   if you think it's contrary to law or an abuse of judicial

24   discretion.  You have 14 days to file your notice of appeal,

25   that is, 14 days after judgment is entered.  You have the right

1    to an attorney, and you have the right to have notice of appeal

2    filed for you.  If you cannot afford the cost of an appeal, you

3    may apply for leave to appeal in forma pauperis.  Do you

4    understand that?

5              THE DEFENDANT:  Yes, ma'am.

6              THE COURT:  And you also may ask Ms. Norwood, who is

7    here today, she is a deputy clerk -- you can ask her to file

8    the notice of appeal for you.  Do you understand that?

9              THE DEFENDANT:  Yes, ma'am.

10             THE COURT:  Mr. Buie, will you discuss with Mr. Bones

11   his right to appeal?

12             MR. BUIE:  Yes, Your Honor.

13             THE COURT:  And will you either file the notice of

14   appeal for him if that's what you decide to do, or will you ask

15   Ms. Norwood to file it in a timely manner?

16             MR. BUIE:  Yes, Your Honor.

17             THE COURT:  All right.  Are there any other things

18   that we need to cover today?

19             MR. GORDON:  No, Your Honor.

20             THE COURT:  Did I cover everything from the probation

21   office?

22             PROBATION OFFICER:  Yes, ma'am.

23             THE COURT:  All right.  Thank you.  Good luck to you,

24   Mr. Bones.

25         Court is in recess.


                    Judith A. Ammons, RPR, CRR, CCR
                     United States Court Reporter

1          (Proceedings concluded at 1:28 p.m.)

2                    C E R T I F I C A T E

3      I, Judith A. Ammons, Official Court Reporter, do hereby

4   certify that the foregoing is a true and correct transcript of

5   proceedings in the above-entitled case.

6

7

8

9   /s/  Judith A. Ammons, RPR, CRR, CCR   Date: February 8, 2011
         United States Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    Judith A. Ammons, RPR, CRR, CCR
                     United States Court Reporter